Our next case is agenda number 12, case number 114137, James Thomas DeHart v. Blanca DeHart. Counsel for the appellant. May it please the Court, Counsel. My name is Edward Sherman, and I represent Blanca DeHart in her capacity as the executive for her late husband, Donald DeHart's estate, and Mrs. DeHart individually as well. There are three issues before this Court on this appeal. Number one, whether Illinois should recognize equitable adoption, and if so, what the parameters of that should be. Number two, whether James DeHart has sufficiently pled his second amendment complaint in accordance with the Illinois Code of Civil Procedure. And finally, issues relating to the attorney-client privilege and a motion to compel. Just briefly, I'd like to mention the fact that James DeHart was born to Virginia Boswell, in 1942, out of wedlock. His natural father was James Staley, Sr. Donald DeHart, the decedent in this case, married Virginia when James was two, and each year thereafter they celebrated their anniversary, but they kept secret the year from family and other people in the outside world. It wasn't until the year 2000 that James DeHart actually discovered that his natural father was James Thomas Staley, Sr. He discovered that when he applied for a passport, which is Exhibit C to the second amendment complaint. And in looking at that passport, that passport identified James Staley, Sr. as his birth father, not Donald DeHart, which is important also for this Court to understand in that if you have a certified record from the register, in this case, Cook County, for a birth certificate, if there is an adoption under the Illinois Parentage Act as well as the Vital Records Act, the birth certificate should be amended to reflect the name of the adopted parent, which was not the case here. And that is part of the record. In this case, that's part of the complaint and incorporated by reference. After he did this, he confronted Donald about this in the allegations of the complaint, where Donald believed he'd adopted him, but at that point in time, that was reflected as far as Donald being confronted with this birth certificate. Subsequent to this, Virginia eventually passed away, and Donald remarried Blanca DeHart. And according to Donald's sister, in a deposition just very briefly, they had a love and affection relationship through their life. But eventually, Donald did execute the will, which is the subject of this appeal. And on that date, which is December 4, 2006, and I will come back to this a little bit more in the argument, which is a critical date, he still had love, affection, and care for James DeHart on that date. It did not diminish. But notwithstanding that, he provided for in a will for his wife, Blanca DeHart, and his two siblings. He did not provide for James. The will, of course, is attached as Exhibit A to the second amendment complaint, so that's incorporated by reference as well. And as part of that will, of course, the will had an attachment, an attestation, or a witness signature that said that at the time he executed the will, the witnesses stated that he was of sound mind and no undue influence. Subsequent to this, eventually Donald passed away, and Mrs. DeHart had the will admitted to probate, and James subsequently filed his will contest action, which we're here for today, seeking to claim a substantial portion of Donald's estate. After the initial will contest was filed, eventually what happened is there was an amendment to the complaint, which led to the second amendment complaint, where probably recognizing the fact that if he is successful in setting aside the will, under intestacy law he would need to establish a contract to adopt or an equitable adoption theory in order to take under the law. Now equitable adoption and contract to adopt has been previously recognized by this state for over 100 years, is an equitable remedy to an unfulfilled contract to adopt. It does not confer actual adopted status on the child. In fact, it allows the child to inherit, through the laws of intestacy, be claimed an heir of the decedent. And as an equitable remedy, it's seeking to fulfill a contract. So the requirement in Illinois under contract to adopt prior to this case, as well as every other state, as referenced in our brief to the ALR that both myself and a counsel for James referenced, is that you have to have a contract, because equity is seeking to fulfill a contract. Now the majority in the appellate court decision said it was reasonable to infer that there was a contract to adopt according to the well-pled facts of the second amendment complaint. However, they do not identify what those facts are. Instead they refer to the case of Monaghan v. Monaghan, a decision of this court from a while back, where it said you could have circumstantial evidence of a contract to adopt. The problem is Monaghan is distinguishable from this case for two reasons, both procedurally and factually. In Monaghan there's actually an allegation of a contract to adopt. It was decided on an evidentiary basis, and the evidentiary basis in Monaghan that was looked at was that the natural mother had basically signed or agreed to sign away her rights to her child, and she actually gave up custody, both of which are missing in this case. Rather, this case is much more similar to the case of In re Estates of Staley. And in that case, which was a 2-6-15 case, just like this one, we have very similar facts. And in that case you had a natural mother who remarried later in life. The husband she remarried held the child out as theirs throughout their entire life. In fact, in Staley they actually had the father, according to the allegations of the complaint, acknowledged in writing that he was the parent of this child. Notwithstanding that, the appellate court of the first district in that case of Staley found that was insufficient as a matter of law to plead a contract to adopt. They referenced the Monaghan case, which is referenced by the appellate court in this case, but in referencing Monaghan they noted the fact that there was a contract pled. And the key to this is to have a contract to adopt or equitable adoption, you have to have a contract which equity is seeking to enforce. And in Illinois under the fact pleading standard you don't just make a conclusory allegation of a contract, you have to plead facts to support each of the elements. You have to plead facts to support an offer, acceptance, and consideration. And if we look at the Second Amendment complaint in this case, you'll notice that there is absolutely no fact pled regarding Virginia Boswell, the mother of James DeHart. There's no fact pled that she was agreeing to give up James DeHart. There's no fact pled that she actually, that there's any custody that was changed. And I'm not talking necessarily that unlike every other case in this state where we've had a contract to adopt and you had the natural mother out of the picture, there's not even allegations of any kind of giving up, intention to give up any of her legal rights to show any kind of consideration. Those are completely missing. Now, apart from these legal deficiencies here, the other issue is what is the public policy going forward? Based on the facts in the Second Amendment complaint, there's no allegation of a contract. What would be sufficient enough? A birthday card? A letter calling someone their son? Someone acting nice and considerate to someone in their life? What would be enough of that? And how long? We're going to have someone that's holding someone out for a day, a year, a life? Do we know the circumstances of that? More importantly, what if they ever get divorced? Every case in this state before this case, and including this case, the child who's claiming to be a contract to adopt, the subject of that, or even equitable adoption in other states, the child has actually been the adoptive father or mother is still in the picture. What happens in the future? And people raise this theory if this court recognizes it, and the parents divorce. Does that mean that that person now has to go ahead and either execute a will to say that I specifically disclaim this person, or are they going to have to just wonder the rest of their life that even though they never formally adopted someone, that this person could be an heir of their estate? Then also another public policy concern for this court is, in Illinois, there are probably a substantial amount of wills. I know we refer to millions of wills in our brief, but how many wills in the state have been drafted not understanding or taking into account the concept of equitable adoption or back sufficient or related to this complaint? Are we going to take the intents of those testators? And mind you, obviously, when we're construing a will, one of the key things is we look at the intent of the testator. Are we going to take the intents of those testators and now deal with whether or not they considered a concept that didn't exist until this case came about? And that could have a substantial effect on wills, trusts, and estate plans throughout this state. That's a concern as well. Now, I understand, I believe adoption serves a very important purpose in society, and I believe the statutory protections of Illinois serve a very good purpose for it. And I think that when people go through an adoption, they have a good placement, a good child that they're ending up with. It works out well. Now, adoption obviously requires the current, the natural parents, the adopting parents to agree, which we're missing any allegation of agreement here. But it also requires a court's evaluation of the best interest of the child. Now, I understand I'm dealing with an equitable remedy for inheritance, but the question is now are we going to have a situation where people are going to work outside the bounds of the adoption statute for either good or bad purposes, and we're avoiding the problems, we're coming into problems here with the best interest of a child. So for those reasons, and the fact that there is no case in the state that I am aware, there's no case in the state prior to this one where you've actually had a contract adopt recognized where the natural mother did not give up the custody of the child's consideration, I respectfully request this court to reverse that decision of the appellate court and find that there were not sufficient facts applied for a contract or equitable adoption, and also that this court does not need to reach the issue of actually having equitable adoption since essentially you need to have a contract in either situation. Now, the other issues in this case are relating to a will contest and related tort claims. One of the claims is that Donald DeHart lacked the capacity to execute the will that's the subject of this appeal. Now, obviously to have a lack of testamentary capacity, you have to show that the person does not have the capacity to know the natural objects of their bounty, the kind and character of their property, and that they disposed of it in some plan formed in their mind. Now, the reason for that, obviously, is that you want to make sure the person has soundness to their mind when they're executing this very important document dealing with their property. In typical cases that have come before the courts of the state before involve people with dementia, maybe alcoholism problems or other situations, and they're using that to demonstrate that the person did not have the capacity at the time they executed the will. In this case, there are none of those allegations. In fact, if you look at Exhibit A to the second amended complaint, which is the will, it incorporates by reference the witnesses who said that according to their personal knowledge, to the extent that they could tell, he appeared to be of sound mind. Now. If we accepted your point on the witnesses, could there ever be a will contest for lack of capacity? I understand how that would be evidence of soundness of mind, right, the attestations. But we also have a complaint that says that there was unsoundness of mind, right? So how do we resolve that? Well, first of all, I'd like to address that as far as soundness of mind. Let me just stop you. Because you're saying, I believe your argument is it's a judicial admission once they attach the complaint that has the witness statements on it. Correct. Or at least they haven't refuted it. I understand they have to attach the complaint, the will to contest it, but there's no allegations in the complaint saying that, you know, whatever, for whatever reason, these witnesses here did not, you know. No, but it's a 2615 motion, right, that's been brought. And we do have allegations in the complaint that we have to take as true that says that there was unsoundness of mind. Well. And I understand, as I said, I can see where there would be proof to the contrary by offering the witnesses attestations. But why is it judicial admission? And I guess my first question remains. How would there ever be a will contest an unsoundness of mind where you'd have to attach a complaint that has the attestations attached to the will itself? I would think that the person making that complaint would need to contest that portion that speaks negatively to what they're seeking. So they would have to make some allegation that notwithstanding this or come up with some factual allegation to refute that or come up with another positive allegation of someone else they would know that says, you know, this person had either dementia, Alzheimer's, alcoholism, you know, something that could kind of work in that to kind of contest that. And I think that would be something that would be necessary. Well, isn't the complaint really saying regardless of these witnesses, the complaint is stating that there was unsoundness of mind in this case and we have to take that allegation as true? You would have to take it as true if there are sufficient facts to support the unsoundness of mind. And the only basis in this complaint for a claim of unsoundness of mind is not the traditional things we're looking at, but a statement in a will which says in the context of it in the appellate court is he stated that I have no children after he held out Don, after he held out James as his child his whole life. The problem with that is that if you look at paragraph 14 of the Second Amendment complaint, the purpose for stating I have no children is that he didn't remember them at the time he executed the will. But paragraph 14 right before that allegation says that on that very same date, as I mentioned before, December 4, 2006, he had a loving, caring, and affectionate relationship Donald did with James. And now we've got an internal conflict as well in that complaint, which is deficient as a matter of law as well. And I understand that under 2615 you resolve the inferences in favor of the person making the complaint, but when they have an internal conflict, that's a problem as well. So from the purposes of that, I think that complaint is insufficient as a matter of law, because if you look at 14 with 15, now he's directly contradicting himself in the pleadings he made. Now, apart from, and so for that reason, I submit that the issue of lack of testamentary capacity is wanting and insufficient as a matter of law. Now, with respect to the issue of undue influence, undue influence, of course, involves two things. Person A, trying to commit some kind of, get someone to do something else and influence them, and person B, going ahead and actually being influenced. And what's required for that is you have to have a specific recital on the manner in which the person's free will is overcome. In this case, the only allegation is in paragraph 22 of the second minute complaint, with a general allegation that, succumbing to Mrs. DeHart's influence, he executed a will stating he had no children. Now, there's no allegation as to whether that was caused by some statement of, like, misrepresentation, some family squabbles, some issue of whether he believed he was a son or not. Those are missing. And the appellate court was referring to the case of In re Estata Hoover, which, again, procedurally is distinguishable from this case, because this case, again, is a 2-6-15. And in Hoover, the court found there was circumstantial evidence to show the influence impacted the testator. The problem is, in Hoover, you had a couple of things we don't have here. Because it was evidentiary and not pleading, you have an issue of a diary that was produced in discovery. In Hoover, the diary showed that the person who drafted, who executed the will, internalized some family comments, namely the family comments that one of his children and his ex-wife had made to him that he was going to disinherit, not that the other child who was being disinherited here had basically planned as part of his divorce to basically leave his kids and his ex-wife destitute. And that went to his moral character, and it influenced him. There's actually evidence in that. Now, I understand that was evidence. But, again, here in this case, we're talking allegations. We don't have the allegation. Rather, this case is much more similar to the case of In re Estata Sutera. In Sutera, it was a 2-6-15 case. And in Sutera, you have a situation where there was an allegation, and the allegation was basically that the person who was eventually the decedent was a homosexual and that he was afraid that he was going to be placed in a home. These people told him to be placed in a home, a nursing home, and they exposed him, and he was concerned about himself. Now, the problem is, again, there was a general allegation that his influence was overcome, but no allegation of the specific manner in recital. And on the appellate decision in that specific case, they noted that in the briefs they talked about how we connected the dots from the influence to the actual will, but that wasn't pled in the complaint, which is the same situation we have here. We have a conclusory allegation. We do not have that connection of the dots. And furthermore, even if the court wants to go beyond that and start to pick out of other facts in the case, again, we know at the time that Donald DeHart executed his will, the paragraph 4 said that he had a loving and caring relationship. The same date, December 4, 2006, he had a loving and caring relationship with James. If Mrs. DeHart, as alleged, and this is just allegations, was trying to influence and destroy that relationship, then how come on the same day he executed the will he had a loving and caring relationship? And with respect to the issues about being a son and adopted, well, Donald clearly knew that he was not James' natural father, and in 2000 he was confronted with a birth certificate that showed he wasn't his natural father. But didn't that conversation go on to establish that Donald also told James that he believed he had legally adopted James with the help of an attorney when James was 2 years old? Yes, it did, but that was his belief, and he was confronted with the very birth certificate to show that it had not occurred. The only other thing I mentioned about undue influence, just very quickly because I know I have limited time, is the appellate court referred to Simon v. Wilson as far as the power of attorney. The one key point of the power of attorney in an undue influence case is you've got to show that it's somehow connected with the procurement of the will or related to the property. It's a conclusory allegation. It's not information of belief, not only that, but there's also no actual connection to that with the procurement of the will. Now, very, very quickly on the tort claims for fraudulent inducement, you need to show that the false statements of Mrs. DeHart caused Donald to sign his will. Well, the three statements in that count, not going back through all of them, were that James was dead or two related to the adoption. Now, James was dead cannot be accurate because Paragraph 14 incorporates that he had a loving and affectionate relationship on the day he executed the will. So that's directly conflicted. And secondly, you have the issue of adoption. And we do know that same thing with respect to that birth certificate that's incorporated by reference, which we can take notice of the fact that he was not adopted. So those aren't false statements. If he was not adopted and he was not dead, then how could misrepresentations actually influence? But more importantly is there's no allegation that somehow he had a moral conviction against leaving property to someone who's not legally his son. There's just no tie-up in that. The same with the interference count as well. There's no tie-up there of but for a certain action that Donald would have done something differently. Donald executed a will, according to the allegations, because Block wanted to execute it. But the fact that he executed a will does not mean that he did not intend to, doesn't affect whether he intended to provide for James or not. He could have. Finally, very briefly on the motion to compel issues, attorney-client privilege does survive the death of the client. However, there's an exception for people claiming through the heir. Claiming is like the heir's legatees, and that's the Wilkinson v. Service case. However, that's only in favor of those claiming through the decedent. And at the trial court, this was under an abusive discretion standard, the trial court in the record was presented with a motion to compel to ask for privileged information. But if I recall correctly, there was no evidence presented to the trial court that James DeHart fit within the limited exception for which the attorney-client privilege should be waived. I see that my time is up, unless there's any other questions. Thank you. Thank you. May it please the court, counsel, Mr. DeHart. Tom Parris on behalf of James DeHart. I'd first like to ask you to join me in looking at the appendix, because I think if we do, we can understand some things that aren't particularly clear. The birth certificate which Jim DeHart used his entire life until he went to the passport office, and that is a birth certificate that got him into school, got a driver's license, and got him married, is there at Exhibit B, A46. That birth certificate has his name on it. He used it for all of those other government purposes, couldn't use it for his passport, and that's when he went down the street. And on March 9, 2000, received from the state of Illinois, or from the county, this birth certificate, Exhibit C. I want to point out a few things about these two birth certificates that sort of support where I think things are here. First of all, Exhibit B at what is the top right, the way I've photocopied it, it says it's a county record, that it's a Cook County record, county clerk's record. Exhibit C is from the state of Illinois, though indeed it came from the Office of Vital Statistics in Cook County, down the street from the passport office. Now, Donald DeHart told Jim that he went to a Homewood lawyer, which is where one would go if you lived on the southeast side of the county, to have this adoption taken care of. In his words, it was all legal. Those are the words that, frankly, many would use, but particularly a farmer, he wouldn't get into details. He would say it's all legal. This birth certificate that's Exhibit B, in many respects, does reflect evidence of what was known at that point. Who changed it is an issue that is not clear, but frankly, it is a birth certificate that Jim DeHart used. Most glaringly, if you look closely at this birth certificate and the right justification of it, you'll see the mother is listed as Virginia Louise Boswell DeHart. Of course, she wasn't DeHart when Jim was born. Her name was not DeHart, but look very closely at DeHart. It runs over what should be the right justification of this document. Somebody prepared this document. I don't know if it was the Homewood lawyer. I don't know if it was the registrar of deeds. I don't know if they worked together. I don't know if it was Virginia and Donald together. But this was given to James, and he used it for 56 years of his life, and intended on using it all of his life until this came to be. And so, in my view, the facts of this case are far more compelling than Monaghan, which talks about a contract that, frankly, I think most courts would consider abhorrent if you actually tried to enforce it. Kids are not property. You can't contract rights back and forth with respect to kids. I mean, enforcing that written contract in any other context outside of probate, which is what we're dealing with here, is an impossibility. And I don't know, you might get disbarred for trying, frankly, or creating a contract to have one parent give up for some sum of money to someone else. What really here we're talking about is equitable remedies. The third district had, I think, the guts to say it's an equitable adoption. Other states have used that phrase. Back in 1958, this court used the phrase contract for adoption and applied other equitable principles. And before I get too far, there are other aspects of these two birth certificates that are similar but don't quite line up. There's handwriting on some and typing of the same facts on the other. And the typing, by the way, is the one that my client had, Exhibit B, for his whole life. And so there was a concerted effort to create that birth certificate. So I think equitable principles and what has been called an equitable adoption really are what is at issue here. And when we look at the maximus of equity, the first, equity regards as done what ought to be done. And I don't know what's wrong with that here. Donald DeHart held him out forever as his son. The one piece of paper in the entire world is this will that we have here where he says, I don't have any children. But if you look at Donald DeHart when he was preparing his obituary at the funeral home, what did he say? He said, I have a son, James DeHart. I have grandchildren, James's children. I have grandchildren, James's. I have great-grandchildren, James's grandchildren. I've pled that in there. So what equity regards to be done, what ought to be done, that's what Donald DeHart wanted done and what he said was done to my client. And he said to the world when he created his obituary there at the funeral home prepaying for his funeral. Equity imputes an intent to fulfill an obligation. Donald DeHart made clear through his words, through his actions, that he intended to be the adopted father of James. He thought he was the adopted father. It was only when confronted with this new birth certificate that the county gave my client that he didn't know that the adoption hadn't occurred. So was he supposed to at that point in the year 2000 when his son was 56, 57 years old start an adoption proceeding? There didn't seem to be any need for that. And I don't think anyone can be blamed for not going in that regard. Mr. Ferris, with regard to birth certificates and adoptions, the birth certificate from the biological mother giving birth and James's name being on that, when there is a legal adoption, is that ever destroyed? Or do those two birth certificates still exist? Because under the new law, an adoptee can view the original birth certificate. In this case, it's beyond the 2615, but actually the parties did take the deposition of the registrar, of the assistant registrar of births in Harvey, and we tried to ascertain just that. And I don't know that that deposition is part of the record, but essentially she told us that there should be in Springfield this original changed birth certificate, or I'm sorry, that the one that was originally issued by Ingalls Memorial Hospital and there in Harvey would be taken out of the file and sent to Springfield and somewhere in a vault down here, there was supposed to be, there should be that. Now, I've talked to the lady and she, until I have a court order, isn't coming up with anything, but that's obviously outside of the record. But I think that that question goes to what I'm trying to demonstrate here, that, you know, in footnote one, which counsel takes issue, I speculate that there was a gentleman's agreement. That's my basis for it right there, is that should not be bleeding over like it is. The typing on Exhibit B, which my client had for his whole life, when you actually get the birth certificate from the vital statistics is handwritten. Now, who did all that, whether it's the Homewood lawyer, whether it's the registrar, I don't know. But the point is, what did Donald think and what are we to do with this situation, given Donald has in every aspect of his life, and I mean every aspect of his life, said that Jim is his son, but on this one day, on this one occasion, says, I have no children. Let me ask you this. Our cases, although, of course, very old, but our cases have talked about a contract to adopt. Could you help flesh that out a little bit and tell me what do you think are the elements required for that kind of contract? Issues about offer acceptance. Is this between the mother and Mr. Jehart? What kind of consideration is there? All those kinds of contract issues. Can you address that? Frankly, it's better addressed in equity, but to the extent one wants to use the Monaghan case, which this court issued in 1958, and talk about that contract, there may be a contract between Donald Jehart and Virginia Jehart in terms of consideration about keeping this a secret, because Virginia was 16 years old when she became pregnant with James. The birth certificate shows she was 17. It actually doesn't show her birth date, but she would have been about 16 years old. So Mr. Staley is 25 years old. It's 1943. They run off. So when Donald comes into the picture, Jim is a year or two old, and there's an agreement eventually reached about their marriage that, hey, we're going to keep this a secret for the good of the family, for the good of the child. So is there consideration in the same way that two businessmen would make a contract? Absolutely not. It's not there. But is there consideration? I don't know. Is that a peppercorn that you would keep this secret? Now, if the contract somehow involves my client, my client held himself out, well, frankly, to this day as Donald Jehart's son. He worked on his farm. That's not very easy work. For his whole life, he, you know. And so is there consideration running between Donald and James? Certainly. Can you have a contract? Can you have consideration for a contract that Jim didn't actually even know existed? That's why I suggest to you that the contract for adoption, simply one should look behind it, and what really is going on there is a stopping equitably from the other side, from saying there isn't some relationship here or some contract. And I think the ALR that both sides point to says that, you know, that whether you call it a contract for adoption or whether you're looking behind this contract for equitable principles, that's what's going on. And if Monaghan is enforceable on those terms, Jehart certainly should be, because the Monaghan case, there's a couple years where this mother has, or this woman has taken in another child for $8 a week. She's going to watch her and then gives her up in some, you know, ledger is noted. An adoption is attempted. What a lawyer, again, whether he's mistaken or what the deal is, but that lawyer is asked about an adoption. He says, we have to find the father. He apparently didn't know that one could discontinue the father's rights through proper notice or through, I would think, publication. Here, another lawyer makes, does he make a mistake? I don't know, but there's a Homewood lawyer involved that I'll never find, but Donald quite clearly says and acts like that that is the case throughout his life. Now, paragraph 14 has been mentioned several times here. Paragraph 14 is in the undue influence count, and I've put in the alternative incapacity and undue influence. Indeed, Donald did love James and provide for him. You can see just a couple years before he died, the whole extended family, four generations go on vacation together, and Donald picks up the tab. He'd sold his 160-acre farm in New Lenox, probably hadn't spent a lot of money as a farmer, and so now he's being generous to the only son he knows. So undue influence count, you know, I'm entitled to plead in the alternative, and I plead lots of facts about undue influence, including the fact that Donald did love and care for Jim, and I don't retreat from those statements, and I think that Illinois law certainly allows me to plead in the alternative on these two theories. Now, Donald's counsel suggests that the settled expectation of testators and there's millions or thousands or hundreds of wills out there. Frankly, these are some pretty unique facts, and I'm not asking this court to extrapolate largely with this and how that would affect wills that are out there. I don't know that facts like this could occur again. And frankly, at a minimum, I mean, think about whether Donald had died first. Everything is going through Virginia to Jim, his mother. Virginia and Donald were married for decades. She passed away a few years before Donald did. To me, frankly, that speaks to equity, but it also speaks to this settled expectation of all these testators out there whose plans are going to be ruined because we recognize in these extraordinary, unique facts what needs to be done and what the Third District was willing to do. The final issue is this attorney-client privilege and whether or not Attorney Peters can speak about what happened here. The facts scream out that we want to know Donald's intention. We want to know Donald's will. We want, you know, in this case, to know what Donald wanted, and we want to know whether Blanca was in that meeting and exerting undue influence over him. Who is in the best position to tell us that? The drafter of this will who met with Donald and, frankly, probably with Blanca as well, and that's what I've alleged because Blanca had all but taken over Donald's affairs in dealing with the developer. It's not entirely clear. There was a 160-acre farm here. Donald, being a gentleman farmer at that point, kept five acres with his farmhouse, bought a house in town in Frankfort, but there were still dealings going on with Hart's Construction over this large project. Blanca came right in on it, took over dealings that he had with an attorney, I've actually noted within my complaint the attorney who drafted a prior will, and if this court wants to rule narrowly, it may do so. I've pled that there was a prior will. I've pled the drafter. His name is Krusemark. He died. I talked to his wife. The files are, you know, not around. But who had that will? It was in the farmhouse where my client was not allowed to go any longer, and Blanca had complete control over. So if you don't want to talk about equitable adoption and the inferences that go on with that, standing, I have standing, Jim DeHart has standing here, based on the allegation of that prior will alone in my view. And so if we don't want to reach the big equitable issues and the contract issues, that's what this case was dismissed on is standing, a 2615 saying my client's a stranger to this matter. My client's not a stranger. It was a prior will that provided for him, provided for Donald DeHart's church and others, and I believe that I'll have testimony to that effect. I know that I'll have testimony to that effect, and I've pled it. So there are narrower ways to get at this if the court wants to, because standing is really why I'm here, and that's what I lost on. So I don't have anything further unless there's more questions about this. Thank you. Thank you. May it please the Court. Working backwards just very briefly here on the motion to compel issues. Now, counsel did not address the abuse of discretion standard. Mind you, the motion to compel and the attorney-client privilege you're dealing with here, we're dealing with a decision of the trial court regarding discovery, and the review of this court is an abuse of discretion. Did the trial court abuse its discretion in not revealing privileged information under the attorney-client privilege to James DeHart? And the record before the trial court for that motion to compel did not include any of the requirements for the limited exception to the attorney-client privilege expressed in Hitt v. Stevens as well as Wilkerson v. Service. Counsel, did you raise this issue in your PLA? I believe I did. I believe it was raised in the PLA and it was raised in the brief, Your Honor. And that was also presented to the appellate court, of course, and the appellate court addressed the limited waiver, but they never addressed the issue of whether or not the trial court abused its discretion. Did the trial court, not having the information in the record before it, as far as this court has as well, to determine whether or not this limited exception applies, is it an abuse of discretion for the trial court to not basically waive the attorney-client privilege to someone who's not established they're entitled to that waiver? I don't think it is. Now, apart from that, counsel cited the ALR, the Bates ALR we both cited, and it's a good ALR because it's a survey of all of the claims of equitable adoption in the country. It looks at a lot of states' law. But one thing in that ALR that's really key to understand is that wherever it exists for equitable adoption, as well as this state for contract to adopt, there has to be a contract. It's the fundamental thing. Counsel's talking about equity. Well, in this case, your equity is to fulfill the intentions of parties to a contract, and you've got to plead the required elements for a contract in the state to have a contract to adopt. And I understand that in this case, there's absolutely no allegations of anything with respect to Virginia. If Donald unilaterally on his own goes ahead and decides he's going to say, I want to make this person my son, does that mean Virginia now all of a sudden, because Donald hired a homeland lawyer and thought it was all legal, does that mean that Virginia now has essentially, without any involvement of courts, the law, or the statute, does that mean Virginia's given up her rights to her kid? Does that mean she can't walk out with him? No. There are no allegations of an agreement to adopt. There's no allegations of the court's involvement. The hiring of a lawyer, and he thought it was a handshake agreement with the registrar that counsel's talking about, and that is part of the argument I had that I think that's improper, because it's not in the record. Well, that would mean that people can go ahead and adopt somebody by just talking to an administrative official or a clerk. That's not appropriate. That frustrates the whole intent of the adoption statute, which is to go ahead and have the parents involved, the natural ones, giving notice to the one who might not be in the picture, the ones who are adopting, and making sure the best interest of the child is taken into account. Briefly, Mr. Sherman, back to the motion to compel, would to accept your argument, would we also have to accept the fact or consider James a stranger? Well, first of all, the record on the appeal, respectfully, Your Honor, there's nothing to indicate that he fits within the requirements. But secondly, I think that if you want to go a step further and say, well, if there is something that we have, I still think James' burden is to prove that he fits within one of those exceptions. I think he needs to show something to the court. We need to have something significant for it. With respect to consideration, counsel talked about a secret. They kept the marriage a secret. He doesn't allege that that was the consideration for the contract. And back in the time that we're talking about as counsel has addressed, children with all due respect born out of wedlock, it's not viewed as accepted by society or understood as it is today. The reason why it's probably a secret, and why they didn't talk about the actual date that they married, and they talked about this whole secret about their date of the year of their marriage, is because they didn't want to, Donald was a gentleman, he didn't want to go ahead and have the outside world knowing that James was born out of wedlock or that Virginia had a child out of wedlock. But there's no allegation connecting that for consideration. And finally, I just want to reiterate the fact that I think it's very important for this court to rely on the precedent it's had for probably almost over 100 years of contract to adopt. When they've had a contract to adopt, you require the agreement. People have relied on that. People have drafted their wills to the extent that I'm assuming a lot of estate planning attorneys don't even know the contract to adopt exists. But most likely when someone sits down with their estate planning attorney and they draft their will, they ask you the two questions. Do you have any children? Have you adopted any children? They probably don't even get the contract to adopt. And if we start establishing not just contract to adopt, which we have here, but going to further things of just holding outs enough, now we're going to have the question of whether or not those people who are drafting those wills and their attorneys, the attorneys drafting the wills are the people who have them drafted, if their real true intentions are carried out. Because if we know that when you look at a will, a lot of times you have the category that says, I leave to my children first therapies that are my children. Well, usually that's drafted by lawyers. You know, some people draft their own, but a lot of times they hire a lawyer to do it. What is their understanding of what a child is? And we really need to get to the intent of the testator on these things. And if we allow this to exist now and also allow it going forward to affect wills that have already been drafted and people maybe have already died in this state, now we're creating a whole bunch of chaos here with respect to those administration of the wills. Because now someone can come in and say, I lived with this person their whole life. He's no longer alive. He can't contest anything I say. And I was held out as his son. I'm his son. I don't have any record of it. I don't have an adoption, which a third party like the courts would be able to get from the registrar. I don't have the natural proof. And, you know, I'm just going to say I'm his son. Well, the problem with that is the person is dead. They're no longer around, unfortunately, and they can't speak for themselves. And this is just going to open up a Pandora's box of people who want to come in. And I understand counsel says this is a very unique set of circumstances. If this court allows for equitable adoption, especially under the facts alleged in this complaint, we can see a lot more of these cases coming through the court system in Illinois in the future where people are saying, I was held out as his son. I'm his son. You know, he held me out. He called me Sonny Boy. All these other fun kinds of things. That's going to become a recurring problem. I don't think this court really should invite. And unless anyone has any other questions, I guess I'm done. No? Thank you. Thank you very much. Mr. Sherman, Mr. Parris, we thank you for your arguments this morning. Case number 114137, James Thomas DeHart v. Blanca DeHart is taken under advisement as agenda number 12. Mr. Marshall, the Illinois Supreme Court stands adjourned until Thursday, January 24, 2013, 9 a.m.